# In the United States Court of Federal Claims

No. 21-867
(Filed: 29 July 2026)*

| | |
|---|---|
| ALLEN BICKEL, | * |
| | * |
| Petitioner, | * |
| | * |
| v. | * |
| | * |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * |
| | * |
| Respondent. | * |

*Jennifer Anne Gore Maglio*, Mctlaw, of Sarasota, FL, for petitioner.

*Austin Egan*, Trial Attorney, with whom were *Alexis B. Babcock*, Assistant Director, *Heather L. Pearlman*, Deputy Director, *Jonathan D. Guynn*, Acting Director, Torts Branch, and *Brett A. Shumate*, Assistant Attorney General, Civil Division, Department of Justice, all of Washington, DC, for the government.

## OPINION AND ORDER

**HOLTE, Judge.**

"'[W]hile most of the Nation[] . . . enjoy[s] great[] benefit from immunization programs, a small but significant number have been gravely injured.'" *Cloer v. Sec'y of Health & Hum Servs.*, 654 F.3d 1322, 1325 (Fed. Cir. 2011) (quoting H.R. Rep. No. 99-908 at 4 (1986)); *see also Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1364 (Fed. Cir. 2019) (Newman, J., dissenting) (quoting *National Childhood Vaccine-Injury Compensation Act: Hearing on S.2117 Before the S. Comm. on Labor & Hum. Res.*, 98th Cong. 2 (1984) (statement of Sen. Orrin Hatch, S. Comm. on Labor & Hum. Res.) ("Senator Hatch cautioned, there is 'a small but significant public health problem—the incidence of harmful and occasionally even fatal reactions to vaccines administered'")). "These few but important injuries create doubts and fears in our National Childhood Vaccination Programs." *Boatmon*, 941 F.3d at 1364 (quoting *National Childhood Vaccine-Injury Compensation Act: Hearing on S.2117 Before the S. Comm. on Labor & Human Res.*, 98th Cong. at 3–4) (statement of Sen. Edward Kennedy, S. Comm. on

* This opinion was initially filed under seal on 21 July 2026 pursuant to Vaccine Rule 18(b) of the Rules of the Court of Federal Claims. The Court provided the parties time to submit proposed redactions in accordance with Rule 18(b). Both parties confirmed they do not propose any redactions. This opinion is now reissued for publication in its original form.

Labor & Human Res.). "'[F]or the relatively few who are injured by vaccines,'" Congress determined the "'opportunities for redress and restitution [were] limited, time-consuming, [and] expensive.'" *Cloer*, 654 F.3d at 1325 (quoting H.R. Rep. No. 99-908, at 6 (1986)). Congress, therefore, "created the Vaccine Program" to "compensate injured persons quickly and fairly" for injuries "either presumed or proven to be causally connected to vaccines." *Id.*

This case turns on the Chief Special Master's rejection of petitioner's "medical theory causally connecting the vaccination and the injury," as required for compensation in *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005). In defining this legal standard, *Althen* and its progeny took care to keep the Vaccine Program quick and fair by clarifying: a "determination of causation in fact under the Vaccine Act involves ascertaining whether a sequence of cause and effect is *'logical' and legally probable, not medically or scientifically certain.*" *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1380 (Fed. Cir. 2009) (citations omitted) (emphasis in original). Nonetheless, while the Federal Circuit has found "*medical* plausibility" too stringent a standard for a medical theory, *see id.* at 1379, it has also found *legal* plausibility too lax a standard, *see Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1121 n.3 (Fed. Cir. 2025). Of importance, Federal Circuit precedent does provide guidance for evaluating a theory of causation when tension exists between medical consensus and the legal standard of preponderance of the evidence:

> While [a] case [may] involve[] the possible link between . . . vaccination and . . . injury, a sequence hitherto unproven in medicine, the purpose of the Vaccine Act's preponderance standard is to allow the finding of causation in a field bereft of complete and direct proof of how vaccines affect the human body.

*Althen*, 418 F.3d at 1280. Despite this guidance, difficult distinctions between medical standards and legal standards of proof have resulted in inconsistent findings among special masters on identical questions—for example, in this case, the Chief Special Master found a tetanus-diphtheria-acellular-pertussis vaccine cannot cause Guillain Barré Syndrome but acknowledged other special masters have found the opposite. *See* Section IX.B, *infra*. Earlier this year, the Federal Circuit, concerned over inconsistent results in a Vaccine Program designed to compensate injured persons quickly and fairly, directed this court to "adopt[] . . . a related-case rule or other mechanisms to avoid inconsistent rulings of the special masters." *Gamboa-Avila v. Sec'y of Health & Hum. Servs.*, 166 F.4th 1318, 1324 (Fed. Cir. 2026). As the Supreme Court observed in *Kisor v. Wilkie*, there are "well-known benefits of uniformity in interpreting genuinely ambiguous rules . . . [as] judges are most likely to come to divergent conclusions when they are least likely to know what they are doing." 588 U.S. 558, 572 (2019). In other words, the best solution to inconsistent rulings is a clear legal standard. *See id.* In the absence of a clear legal standard, the Court must still apply the best "mechanism to avoid inconsistent rulings" for this case: Federal Circuit precedent defining the legal standard. *See* Section IX, *infra*.

The background for this case is straightforward. In early May 2019, petitioner suffered an upper respiratory infection. On 24 May 2019, petitioner received a tetanus-diphtheria-acellular-pertussis vaccine following a dog bite. Petitioner began experiencing neuropathy and muscle cramps in early June 2019, was admitted to the hospital for worsening symptoms in July

2019, and was ultimately diagnosed with Guillain Barré Syndrome in December 2019. In February 2021, Mr. Bickel filed a petition for compensation, alleging his tetanus-diphtheria-acellular-pertussis vaccine caused his Guillain Barré Syndrome. Petitioner later provided expert reports and medical literature to propose "molecular mimicry" as his "medical theory causally connecting the vaccination and the injury." Five years after Mr. Bickel filed his petition, on 23 January 2026, Chief Special Master Corcoran denied petitioner compensation, concluding "more must be provided to show molecular mimicry is a reasonable mechanistic explanation for an autoimmune process." Petitioner filed a Motion for Review, arguing the Chief Special Master failed to set forth a rational basis to deny compensation. For the following reasons, the Court grants petitioner's Motion for Review and remands to the Chief Special Master for proceedings consistent with this Order.

## I. Petitioner's Medical History and Tdap Vaccination

On 24 May 2019, petitioner Allen Bickel received a tetanus-diphtheria-acellular-pertussis ("Tdap") vaccine after suffering a dog bite. *See* Vaccination Rec. from Johns Hopkins Community Physicians – Fulton, Ex. 1 at 1 ("Vaccination Record"), ECF No. 13-1; Med. Recs. from John Hopkins Community Physicians, Ex. 2 at 10 ("Johns Hopkins Records"), ECF No. 13-2. At the time of vaccination, petitioner was 62 years old and, despite several chronic conditions and a recent upper respiratory infection ("URI"), petitioner appeared well and reported feeling well. *See* Johns Hopkins Records at 10–11; Vaccination Record at 2; *see also* Med. Recs. from Fast Track Urgent Care, Ex. 13 at 23–24 ("Urgent Care Records"), ECF No. 14-9 (petitioner's urgent care visit for URI symptoms).

On 17 June 2019, Mr. Bickel called his primary care provider concerned he had Lyme disease because he was experiencing neuropathy in his hands and toes, joint pain, muscle cramps, and malaise after a tick bite two weeks earlier. *See* Johns Hopkins Records at 13–15. On 18 June 2019, Mr. Bickel saw his nephrologist to address acute renal insufficiency and again "complain[ed] of symptoms compatible with a peripheral neuropathy." Medical Records from Montgomery Renal Associates, Ex. 8 at 15 ("Renal Records"), ECF No. 13-10. On 20 June 2019, Mr. Bickel saw his primary care provider for a neurological exam (which showed normal results) and Lyme disease testing (which came back negative). *See* Johns Hopkins Records at 7, 15. One day later, petitioner went to urgent care for sharp abdominal pain and a cough. *See* Urgent Care Records at 26–27. On 24 June 2019, Mr. Bickel returned to his primary care provider for a blood pressure check and reported "concern[] because he [was] experiencing some headaches." Johns Hopkins Records at 17–18.

On 4 July 2019, Mr. Bickel went to an emergency room for bilateral upper and lower extremity weakness, numbness, muscle cramping, dyspnea upon exertion, and a shuffling gait. *See* Med. Recs. from MedStar Georgetown Univ. Hosp., Ex. 9, Volume III at 402 ("MedStar Georgetown Records Volume III"), ECF No. 14-3. Mr. Bickel reported bilateral lower extremity weakness began a month prior to the visit while upper extremity weakness began two weeks later. *See id.* The clinician assessing Mr. Bickel noted "the idea of Guiallain [sic] Barre was proposed by his nephrologist but this has not been confirmed." *Id.*

Mr. Bickel was admitted to the hospital from 4 July 2019 to 7 July 2019 and underwent a neurology exam, which revealed extremity weakness and diminished reflexes. *Id.* at 402, 410–11. The attending neurologist's attestation left a note to "[c]onsider GBS" and to conduct "[l]abwork for other causes of neuropathy." *Id.* at 411. On 5 July 2019, an occupational therapist evaluated petitioner and noted "deficits in strength, endurance, sensation, standing balance and tolerance, and functional mobility resulting in decreased independence in [activities of daily living]." MedStar Georgetown Records Volume III at 437. On 6 July 2019, a physical therapist observed Mr. Bickel "mobilized in the room, around the unit and on the stairs with no [loss of balance]" and had "[n]o [physical therapy] needs at this time." *Id.* at 442. A spinal MRI the same day showed "[d]egenerative changes caus[ing] mild bilateral foraminal stenosis at C5-C6, moderate bilateral foraminal stenosis at L4-L5, and moderate right foraminal stenosis at L5-S1." *See* Med. Recs. from MedStar Georgetown Univ. Hosp., Ex. 9, Volume IV at 533–34 ("MedStar Georgetown Records Volume IV"), ECF No. 14-4.

On 7 July 2019, Mr. Bickel was discharged from the hospital. *See* Med. Recs. from MedStar Georgetown Univ. Hosp., Ex. 9, Volume II at 324, ECF No. 14-2. Petitioner's motor exam showed Mr. Bickel had four out of five strength or better in his extremities and was capable of independent movement but had decreased sensation and reflexes. *Id.* at 327. Mr. Bickel's discharge notes also indicated his assessments did "not seem to fit GBS, as [his cerebrospinal fluid] protein [was] not elevated despite weeks from onset," but did suggest "an acute axonal polyneuropathy/possibly ganglionopathy, given the last site of involvement was in mandible bilaterally 1 week prior to admission." *Id.* at 325. Mr. Bickel was instructed to follow up with his neurologist to discuss the results of his labs and to schedule an electromyography ("EMG") and nerve conduction study ("NCS"). *See Id.* at 328. Mr. Bickel's condition upon discharge was described as "improved/stable." *Id.*

On 11 July 2019, Mr. Bickel followed up with his neurologist and underwent the recommended EMG and NCS testing. *See* Med. Recs. from MedStar Georgetown Univ. Hosp., Ex. 9 at 852–853, ECF No. 14-5. The study returned "[a]bnormal" results with "electrophysiologic evidence indicat[ing] a moderate, generalized, subacute, motor and sensory polyneuropathy with mixed axonal and acquired demyelinating features." *Id.* at 853.

On 15 July 2019, Mr. Bickel began outpatient physical therapy. Med. Recs. from ATI Physical Therapy, Ex. 12 at 6 ("Physical Therapy Records"), ECF No. 14-8. His initial evaluation identified several functional limitations, including ascending and descending stairs, dressing, driving, exercising, walking, transferring in and out of chairs, and standing for an extended period. *See id.* On 24 July 2019, at a follow-up visit with his primary care provider, Mr. Bickel reported continued loss of sensation in his extremities, and progress notes from the visit noted "[h]e was recently admitted to Georgetown hospital . . . and diagnosed with Guillan [sic] Barre Syndrome." *See* Johns Hopkins Records at 21. On 4 November 2019, Mr. Bickel visited his endocrinologist, who made note of his continued neuropathy and stated Mr. Bickel "[h]ad GBS after Tetanus shot." Med. Recs. from MedStar Medical Group Olney Pro. Park, Ex. 4 at 6, ECF No. 13-4.

On 17 December 2019, Mr. Bickel's neurologist evaluated him "for numbness/tingling and pain in hands/feet, [and] gait imbalance." *See* Renal Records at 147. Despite overall

improvement since hospitalization, petitioner reported muscle cramping in his lower extremities, an occasional "intense burning sensation," and a newly developed tremor in his arms and hands which began in October 2019. *See id.* The neurologist noted, based on Mr. Bickel's spinal MRI and EMG/NCS results, it was possible he had axonal GBS which was inactive at the time of hospitalization. *See id.* at 149. The neurologist's attestation noted "recurrence [of GBS] would not be expected," but recommended "avoidance of vaccines [for one year] if able, from time of onset of [symptoms]." *See id.*

On 3 January 2020, after 25 sessions, Mr. Bickel was discharged from physical therapy at his request due to his work schedule. Physical Therapy Records at 6. The physical therapy records covered evaluations from 2019 to 2020 and noted a "physician's diagnosis of . . . Guillain-Barre Syndrome." *See id.* According to the discharge summary, Mr. Bickel was "doing a lot better," though he was still struggling with balance and pain. *See id.*

On 22 September 2022, Mr. Bickel visited his neurologist with complaints of residual hand numbness, tremors and dexterity limitations. *See* Updated Med. Recs. from MedStar Georgetown Univ. Hosp. Neurology (Dec. 2019 through Sept. 2022), Ex. 30 at 9, ECF No. 34-9. At this point, Mr. Bickel's neurologist deemed "mild GBS" "a primary consideration based on [Mr. Bickel's] timeline of symptoms." *Id.* at 10. Though there was overall improvement in his condition, Mr. Bickel continued to report similar symptoms in both 2023 and 2024. *See* Additional Updated Med. Recs. from MedStar Georgetown Univ. Hosp. Neurology (Dec. 2022 through Mar. 2023), Ex. 31 at 2–3 ("Additional Updated Neurology Records"), ECF No. 34-10; Updated Med. Recs. from MedStar Georgetown Univ. Hosp. Neurology (May 2024), Ex. 129 at 10, 12, ECF No. 58-1.

## II. Procedural History Before the Special Master

On 4 February 2021, Mr. Bickel filed a petition for compensation against the Secretary of Health and Human Services, alleging "[a]s a result of receiving [the Tdap] vaccination . . . [he] suffered from [GBS]." Pet. at 1, ECF No. 1. The petition was assigned to Chief Special Master Corcoran in February 2021. *See* Notice of Assignment, ECF No. 4; *see also* Activation and Reassignment Order, ECF No. 21; Notice of Reassignment, ECF No. 22; Reassignment Order, ECF No. 24. After Mr. Bickel filed medical records and a statement of completion in 2021, the parties engaged in settlement discussions before "reach[ing] an impasse" in 2022. Pet's Mot. for Entitlement Ruling on the Rec. at 1–2, ECF No. 61. In the years to follow, petitioner filed additional medical records along with expert reports from Dr. Norman Latov and Dr. Sohail Ahmed and supporting medical literature. *See* Pet's Ex. List, ECF No. 59; Medical Expert Rpt. of Dr. Norman Latov, Ex. 32 ("Latov Initial Rpt."), ECF No. 37-1; Medical Expert Rpt. of Dr. Sohail Ahmed, Ex. 79 ("Ahmed Initial Rpt."), ECF No. 47-1. The government filed expert reports from Dr. Brian Callaghan and Dr. You-Wen He with supporting medical literature. *See* Expert Rpt. of Dr. Callaghan, Ex. A ("Callaghan Initial Rpt."), ECF No. 40-1; Expert Rpt. of Dr. He, Ex. 45 ("He Initial Rpt."), ECF No. 45-1. Petitioner and the government filed supplemental reports from all four experts. *See* Suppl. Medical Expert Rpt. of Dr. Norman Latov, Ex. 59 ("Latov Suppl. Rpt."), ECF No. 43-1; Suppl. Medical Expert Rpt. of S. Sohail Ahmed, M.D., M.B.A., Ex. 100 ("Ahmed Suppl. Rpt."), ECF No. 55; Expert Rpt. of Dr. Callaghan, Ex. E ("Callaghan Suppl. Rpt.") ECF No. 49; Expert Rpt. of Dr. He, Ex. F ("He Suppl. Rpt."), ECF

No. 52-1. On 29 May 2025, petitioner filed a Motion for Ruling on the Record, ECF No. 61. The government filed its Response on 7 July 2025. *See* Gov't's Resp. to Pet's Mot. for Ruling on the Rec., ECF No. 63. On 23 January 2026, the Chief Special Master determined the matter could be fairly resolved via ruling on the record and denied entitlement for petitioner. Entitlement Dec. at 1 ("SM Dec."), ECF No. 64.

## III. The Special Master's Decision Denying Entitlement

The Chief Special Master denied petitioner compensation on the basis petitioner did not preponderantly establish the Tdap vaccine caused his GBS. SM Dec. at 1–2. Petitioner's claim is a Non-Table Injury, and the Chief Special Master conducted his analysis using the three-prong *Althen* test. *See* SM Dec. at 20–21 (discussing applicable law and petitioner's Non-Table claim). Before the analysis section of the Entitlement Decision, *see id.* at 27–33, the Chief Special Master extensively summarized: (1) Mr. Bickel's medical history before and after receipt of the Tdap vaccine, *see id.* at 2–4; (2) the expert reports submitted by both parties, *see id.* at 4–16; (3) the procedural history of Mr. Bickel's petition, *see id.* at 16; (4) the parties' arguments, *see id.* at 16–20; (5) and applicable law, *see id.* at 20–27. The first three pages of the Chief Special Master analysis provide an overview of GBS and how it has been treated in prior vaccine injury claims. *See id.* at 27–30.

The Chief Special Master devoted the final three pages of the Entitlement Decision to his analysis of Mr. Bickel's claim, concluding Mr. Bickel failed to carry his burden of proof under the *Althen* test because the "existing medical science" does not satisfy the first *Althen* prong. *See* S.M. Dec. at 30–33. The Chief Special Master summarized his reason for denial with a bullet point list of common deficiencies in the causal connection theory between the Tdap vaccine and the onset of GBS. *See id.* at 30–31 (citations omitted). The Chief Special Master then acknowledged Mr. Bickel's petition involved "a slightly different set of experts" from prior cases, but stated the record revealed nothing new to better support causation than in prior cases. *See id.* at 32. The Chief Special Master briefly referenced petitioner's expert's presentation of Basic Local Alignment Search Tool ("BLAST") peptide sequence search results, but stated a search result returning sequence homologies is insufficient on its own to support a theory of molecular mimicry. *See id.* The Chief Special Master declined to evaluate the expert reports further in his analysis and, drawing on his prior experience, found Mr. Bickel's claim lacked preponderant support necessary for satisfying *Althen* prong one. *See id.* at 30–33.

## IV. The Parties' Expert Reports

### A. Petitioner's Expert Reports from Dr. Norman Latov

Dr. Norman Latov, a neurologist, presented two expert reports for petitioner. Curriculum Vitae of Dr. Norman Latov, Ex. 33, ECF No. 37-2; Latov Initial Rpt.; Latov Suppl. Rpt. In his first report, Dr. Latov proffered two possible mechanisms by which "[v]accines can induce autoimmune disease, including neuropathy or GBS and its variants:" (1) molecular mimicry; and (2) bystander activation. *See* Latov Initial Rpt. at 4. According to Dr. Latov, molecular mimicry "occurs when there is a structural homology, in sequence or conformation, between an exogenous agent, such as a vaccine or infection, and a self or autoantigen that is subsequently

targeted by the immune response." *Id.* at 5. The "immune reactivity against the foreign agent results in cross reactivity with the self-antigen, with subsequent tissue damage and autoimmune disease." *Id.* Bystander activation, Dr. Latov explained, occurs when "infection, medications, or immunization . . . stimulate the immune system to overcome immune tolerance, allowing activation of the autoreactive cells, resulting in autoimmune disease." *Id.* Dr. Latov opined because "[v]accination is a recognized trigger of GBS, and [Mr. Bickel] first developed GBS at approximately 3 weeks following administration of the vaccine, within the elevated risk period[,] [i]t is more likely than not that he had the Guillain-Barre syndrome that was triggered by the Tdap vaccine." *Id.* at 6. Dr. Latov concluded his first report with a paragraph explaining why Mr. Bickel's medical history would be inconsistent with "non-vaccine potential causes." *See id.* at 7. In his second report, Dr. Latov provided supplemental explanations of molecular mimicry and bystander activation as specifically applied to Tdap and GBS in view of case reports and Institute of Medicine publications. *See generally* Latov Suppl. Rpt.

**B. Petitioner's Expert Reports from Dr. Sohail Ahmed**

Dr. Sohail Ahmed is a practicing clinician in immunology and an academic investigator, who presented two reports on immunological causation for petitioner. Curriculum Vitae of Dr. Sohail Ahmed, Ex. 80, ECF No. 47-2; Ahmed Initial Rpt.; Ahmed Suppl. Rpt. In his first report, Dr. Ahmed relied on a BLAST analysis and relevant publications to establish cross-reactivity between Tdap-induced antibodies and neuronal membrane proteins associated with GBS to support Mr. Bickel's causal theories. Ahmed Initial Rpt. at 1. Dr. Ahmed's BLAST search results "demonstrated a high level of mimicry between 12-16-mer protein sequences contained in the BOOSTRIX (aluminum-adjuvanted) Tdap vaccine and human neuronal membrane proteins involved in GBS pathogenesis[, with] '[i]dentical matches' approaching 54%." *Id.* at 5; *see also* Ahmed Suppl. Rpt. at 23 (citing Gerald P. Linette et al., *Cardiovascular Toxicity and Titin Cross-reactivity of Affinity-enhanced T Cells in Myeloma and Melanoma*, BLOOD (8 Aug. 2013), Ex. 123, ECF No. 55-24; Brian J. Cameron et al., *Idenfication of a Titin-derived HLA-A1-presented Peptide as a Cross-reactive Target for Engineered MAGE A3-directed T Cells*, SCI. TRANSL. MED. (7 Aug. 2013), Ex. 124, ECF No. 55-25, in which 55.6% identical peptide strings were used to explain how melanoma and multiple myeloma clinical trial treatments caused the death of two patients). Dr. Ahmed also discussed two publications "mapping the 'antigenic epitopes' of the tetanus toxoid (TT) and diphtheria toxoid (DT) proteins," the results of which Dr. Ahmed asserts corroborate his findings of cross-reactivity. *See id.* at 8 (citing R. da Silva Antunes et al., *Definition of Human Epitopes Recognized in Tetanus Toxoid and Development of an Assay Strategy to Detect Ex Vivo Tetanus CD4+ T Cell Responses*, PLOS ONE (Jan. 12, 2017), Ex. 88, ECF No. 47-10; B. Diethelm-Okita et al., *Universal Epitopes for Human CD4+ Cells on Tetanus and Diphtheria Toxins*, 181 J. INFECT. DIS. 1001, 1002 (2000), Ex. 89, ECF No. 47-11 (finding peptide sequences on tetanus and diphtheria toxoids similar to human proteins). Dr. Ahmed also provided detailed responses to government's expert reports to rebut their criticisms of Dr. Latov's expert reports. *See id.* at 9–30. Dr. Ahmed's supplemental report reiterated the opinions expressed in his first report and provided extensive responses to the government's expert reports. *See* Ahmed Suppl Rpt. Dr. Ahmed concluded, "to a reasonable degree of medical and scientific certainty regarding the medical history, laboratory tests provided, and the BLAST analysis, . . . Mr. Bickel more likely

than not developed GBS from receipt of the aluminum-adjuvanted BOOSTRIX Tdap vaccine." Ahmed Initial Rpt. at 31.

### C. The Government's Expert Reports from Dr. Brian Callaghan

Dr. Brian Callaghan, a neurologist, prepared two reports for the government. *See* Dr. Callaghan CV, Ex. B, ECF No. 40-8; Callaghan Initial Rpt.; Callaghan Suppl. Rpt. In his first report, Dr. Callaghan disputed Dr. Latov's general causation theory, stating "[a]fter an extensive literature review, I was unable to find biologic evidence linking the Tdap vaccine with GBS." Callaghan Initial Rpt. at 6. Additionally, Dr. Callaghan criticizes Dr. Latov's reliance on case reports, noting "a proximate temporal relationship alone is insufficient to show causation." *Id.* at 5. Considering petitioner's prior URI and "strong epidemiologic support for an association between URI and GBS," Dr. Callaghan asserts "there is far greater evidence that supports a nonvaccine cause of GBS, than an alleged vaccine cause." *Id.* at 7 (citations omitted). In Dr. Callaghan's second report, he questioned Dr. Ahmed's reliance on case reports, VAERS data, and a 1994 Institute of Medicine report instead of the 2012 Institute of Medicine Report. Callaghan Suppl. Rpt. at 1–2. Dr. Callaghan also critiqued Dr. Ahmed's dismissal of the Mr. Bickel's URI because, while Dr. Ahmed argued petitioner had a non-viral bacterial sinus infection, Dr. Callaghan argues the nature of petitioner's URI (viral or bacterial) is unclear. *Id.* at 2. Dr. Callaghan concludes his second report by stating "there is evidence of a more likely nonvaccine cause, namely URI, of GBS based on multiple rigorous epidemiologic studies." *Id.*

### D. The Government's Expert Reports from Dr. You-Wen He

Dr. You-Wen He, a professor of immunology at Duke University Medical Center and a medical doctor, prepared two reports for the government. Curriculum Vitae, You-Wen He, M.D. Ph.D., Ex. D, ECF No. 45-32; He Initial Rpt.; He Suppl. Rpt. In Dr. He's first report, Dr. He criticized Dr. Latov's causation theories as unsupported by reliable evidence. He Initial Rpt. at 15. Dr. He challenged the "old theory" of molecular mimicry in part on the basis "[m]ere sequence similarity cannot be used to conclude that vaccines cause autoimmune diseases." *Id.* at 5–6. Dr. He also disagreed with Dr. Latov's bystander activation theory, stating "[b]ystander activation has never been shown to be a cause of autoimmune diseases." *Id.* at 6. Dr. He then criticized: (1) Dr. Latov's reliance on case reports which had been reviewed in studies finding no causal relationship between Tdap and GBS; and (2) Dr. Latov's use of the VAERS database, considering "VAERS reporting has not been used as epidemiologic evidence in any of the authoritative systematic studies." *Id.* at 11–12 (citations omitted). Dr. He proposed Mr. Bickel's GBS was more likely caused by his URI and the contributing factor of severe obesity. *See id.* at 13. In his second report, Dr. He primarily responded to Dr. Ahmed's reports and responses. Ahmed Suppl. Rpt. at 1. Dr. He criticized Dr. Ahmed's BLAST searches as "entirely expected" considering "sequence homology between microbial pathogen and human proteins is a common phenomenon." *Id.* at 2. Dr. He also asserts the studies Dr. Ahmed relies on as evidence of cross-reactivity "by no means provide evidence to support Tdap vaccination would have induced cross-reactive antibodies to neuronal membranes and cause GBS" because "[m]ere sequence homologies and identification of epitopes do not suggest any pathological roles in autoimmune disease development." *Id.* at 3–4. Dr. He concludes "to a reasonable degree of medical

probability . . . there is no reliable evidence to support the petitioner's experts' theory that the Tdap vaccine caused Mr. Bickel's GBS." He Initial Rpt. at 15.

## V. Parties' Arguments and Petitioner's Motion for Review

On 23 February 2026, petitioner moved for review of the Chief Special Master's Entitlement Decision. *See* Mot. for Rev., ECF No. 68, 68-1. Petitioner contends the Chief Special Master's "Decision was erroneous" because the Chief Special Master "fail[ed] to consider the relevant evidence of record" and "fail[ed] to set forth a rational basis for his Decision." *Id.* at 5, 13. In its response, the government argues the Chief Special Master "properly considered all of the evidence in the record," "correctly evaluated petitioner's evidence under the applicable legal standards, and set forth a rational basis for his Decision." Gov't's Resp. at 6–7, ECF No. 70.

### A. Petitioner's Argument the Chief Special Master Failed to Consider Relevant Record Evidence

Petitioner argues the Chief Special Master "erroneously judged this case using his analysis and conclusions of evidence from past cases instead of evaluating the individual circumstances and record evidence of this case" and failed "to address new evidence adduced by Mr. Bickel, including new and significant medical literature submitted by his experts." Mot. for Rev. at 5. According to petitioner, "the Decision did not analyze the evidence submitted in support of Mr. Bickel's claim" and incorrectly concluded "[p]etitioner had not filed new medical literature that would better support causation." *Id.* at 7 (citing SM Dec. at 32). Petitioner claims to have filed approximately fifty new pieces of medical literature but argues there are two articles which are particularly relevant to the *Althen* prong one causation analysis. *Id.* at 7–8. According to petitioner, Exhibits 88 and 89 support petitioner's molecular mimicry theory by identifying antigenic epitopes contained in the Tdap vaccine. *See id.* at 8 (citing R. da Silva Antunes et al., *Definition of Human Epitopes Recognized in Tetanus Toxoid and Development of an Assay Strategy to Detect Ex Vivo Tetanus CD4+ T Cell Responses*, PLOS ONE (Jan. 12, 2017), Ex. 88, ECF No. 47-10; B. Diethelm-Okita et al., *Universal Epitopes for Human CD4+ Cells on Tetanus and Diphtheria Toxins*, 181 J. INFECT. DIS. 1001, 1002 (2000), Ex. 89, ECF No. 47-11). Petitioner further contends the Chief Special Master failed to conduct a careful review of the record because the Decision did not adequately review petitioner's BLAST research. *See* Mot. for Rev. at 10–12.

The government contends "[t]he Decision makes clear that the Chief Special Master considered the entire record in this case[.]" Gov't's Resp. at 6. In support of the government's argument, the government notes special masters are presumed to have considered the relevant record evidence, and this presumption is only overcome when a special master "affirmatively indicates he did not consider a piece of evidence." *Id.* at 6–7. Further, the government states "[s]pecial masters are not required to discuss every piece of evidence in a decision, so long as they address the parties' positions and arguments." *Id.* at 9 (citations omitted). The government also challenges petitioner's argument the Chief Special Master failed to adequately analyze Exhibits 88 and 89. *Id.* at 9. Though petitioner asserts the importance of these studies to their case, the government notes "[neither of the studies] were referenced or cited in petitioner's

Motion for Ruling on the Record." *Id.* In the government's view, if the studies were critical to petitioner's causation analysis, petitioner would have included them in the Motion for Ruling on the Record. *See id.* at 9–10. Further, the government argues it is "impractical for the Chief Special Master to endeavor to discuss every single item in his Decision[,]" *id.* at 7, and further characterizes petitioner's position as a "post hoc rationalization in seeking grounds for review," *id.* at 10. The government also contends the Chief Special Master "sufficiently discussed" petitioner's BLAST search results in his Decision. *See* Gov't's Resp. at 10. The government notes the Chief Special Master generally critiqued petitioner's molecular mimicry theory by emphasizing the "limited evidentiary value to homology showings." *Id.* at 11 (quoting SM Dec. at 32). The government argues the Chief Special Master described petitioner's argument as "the same molecular mimicry theory as in previous cases" and "demonstrate[d] that he analyzed both petitioner's molecular mimicry theory concerning homology, and also the many weaknesses of that theory as articulated by respondent's experts." *See id.*

### B. Petitioner's Argument the Chief Special Master Failed to Set Forth a Rational Basis for the Decision

Petitioner argues the Chief Special Master failed to set forth a rational basis for his Decision by "shortcut[ting] an evaluation and analysis of the evidence presented in this case by instead listing out the rulings [he] has made in previous cases and pronouncing them equally applicable here." *See* Mot. for Rev. at 13. Petitioner states causation is to be evaluated based on evidence presented in each case, and a Decision must set forth its findings with specificity. *See id.* at 5, 15 (citations omitted). Petitioner claims the bullet points do not reflect the Decision's review of the record and "impede[] this Court's ability to review the Decision, warranting reversal." *Id.* at 13. Instead of analyzing petitioner's particular causation theory, petitioner states the Chief Special Master "relied on a bullet point list summarizing the purported deficiencies in any claim that the Tdap vaccine can cause GBS." *Id.* at 14 (citing SM Dec. at 28, 31). Petitioner describes the bulleted list as a "cheat sheet" listing its points in a conclusory fashion without a reasoned explanation. *See id.* Petitioner argues a decision must reflect a careful review of the record and "[n]either conclusory statements nor citation to unsupportive cases provide adequate support for a legal conclusion or factual finding." *Id.* at 15 (citations omitted). Additionally, petitioner contends the cases the Chief Special Master cites as general support for the bullet point list lack legal reasoning, *see id.* at 15–16, and any bulleted items which have legal backing are "based on evidence found in those cases and not in the present case," *id.* at 18.

The government contends the Chief Special Master appropriately relied on his "substantial prior experience with similar cases involving the same vaccine and injury compensation." Gov't's Resp. at 7–8. The government argues "[i]t is well settled that special masters may rely on previous cases in articulating a rational basis for their decision." *Id.* at 8 (citations omitted). Additionally, the government maintains it is important for special masters to utilize their body of knowledge and accumulated expertise when deciding vaccine cases. *See id.* According to the government, the Chief Special Master used cases similar to the present case to highlight the recognized weaknesses of petitioner's molecular mimicry theory. *See id.* at 12. The government contends using previous cases to deny compensation in this case is not erroneous, because the causal theory common to all the cases was itself categorically

insufficient. *Id.* The government states "the Chief Special Master appropriately applied his prior case law as part of the basis for his decision" and it "was well within the Chief Special Master's discretion" to do so. *Id.* at 9, 13.

## VI. Legal Standard

### A. The Court's Standard of Review of a Special Master's Decision

The National Childhood Vaccine-Injury Compensation Act entrusts this court with reviewing a Special Master's decision upon timely motion of either party. *See* 42 U.S.C. § 300aa-12(e)(1)–(2). In reviewing the record of the proceedings before the Special Master, the Court may: (1) "uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision;" (2) "set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law;" or (3) "remand the petition to the special master for further action in accordance with the court's direction." *Id.* § 300aa-12(e)(2). "Fact findings are reviewed . . . under the arbitrary and capricious standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard." *Saunders v. Sec'y of Health & Hum. Servs.*, 25 F.3d 1031, 1033 (Fed. Cir. 1994) (quoting *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992)).

In reviewing a special master's decision, a court does not "reweigh the factual evidence[,] assess whether the special master correctly evaluated the evidence[, or] examine the probative value of the evidence or the credibility of the witnesses[—t]hese are all matters within the purview of the fact finder." *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000) (quoting *Munn*, 970 F.2d at 871). "Reversal is appropriate only when the special master's decision is arbitrary, capricious, an abuse of discretion, or not in accordance with the law." *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 718 (2009). The arbitrary and capricious standard "is a highly deferential standard of review:" "[i]f the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991).

### B. The Standard of Causation in Vaccine Cases

"A petitioner seeking compensation under the Vaccine Act must prove by a preponderance of the evidence that the injury or death at issue was caused by a vaccine." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1341 (Fed. Cir. 2010) (citing 42 U.S.C. §§ 300aa-11(c)(1), -13(a)(1)). "A petitioner can show causation under the Vaccine Act in one of two ways": (1) "by showing that she sustained an injury in association with a vaccine listed in the Vaccine Injury Table," in which case "causation is presumed"; or (2) "if the complained-of injury is not listed in the Vaccine Injury Table . . . the petitioner may seek compensation by proving causation in fact." *Id.* at 1341–42 (internal citations omitted). Vaccine cases employ a burden shifting standard: "[o]nce the petitioner has demonstrated causation, she is entitled to compensation unless the government can show by a preponderance of the evidence

that the injury is due to factors unrelated to the vaccine." *Id.* at 1342 (citing *Doe v. Sec'y of Health & Hum. Servs.*, 601 F.3d 1349, 1351 (Fed. Cir. 2010); 42 U.S.C. § 300aa-13(a)(1)(B)).

"When a petitioner has suffered an off-Table injury . . . [the Federal Circuit] has established the following test for showing causation in fact under the Vaccine Act:"

> [The petitioner's] burden is to show by preponderant evidence that the vaccination brought about her injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

*Broekelschen*, 618 F.3d at 1345 (quoting *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005)). Under the first prong of *Althen*, "[a] petitioner must provide a 'reputable medical or scientific explanation' for its theory." *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019) (quoting *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010)). "While it does not require medical or scientific certainty, [the explanation] must still be 'sound and reliable.'" *Id.* (quoting *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548–49 (Fed. Cir. 1994)). Petitioners "need not produce medical literature or epidemiological evidence to establish causation under the Vaccine Act." *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009). Where such evidence is introduced, it must not be viewed "through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380.

## VII. Petitioner's Bases for Review of the Chief Special Master's Entitlement Decision

Petitioner's primary argument for review is the Chief Special Master's Decision is arbitrary and capricious because it failed to consider relevant record evidence and failed to set forth a rational basis. *See* Section V, *supra*. Petitioner argues "the Chief Special Master erroneously judged this case using his analysis and conclusions of evidence from past cases instead of evaluating the individual circumstances and record evidence of this case." Mot. for Rev. at 5. Petitioner further argues "[t]he Decision's findings here fail to reveal the Chief Special Master's reasoning, impeding any review by this Court." *Id.* at 19. This primary argument revealed secondary disputes on the correct standard under *Althen* prong one. *See* Section IX, *infra*. Accordingly, the Court first reviews whether the Chief Special Master's Decision is arbitrary and capricious, *see* Section VIII, *infra*, then reviews the *Althen* prong one standard, *see* Section IX, *infra*.

## VIII. Whether the Chief Special Master's Decision is Arbitrary and Capricious

To avoid reversal under the arbitrary and capricious standard, a special master must "consider[] the relevant evidence of record, draw[] plausible inferences, and articulate[] a rational basis for the decision." *Hines v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991). "We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision." *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) (citation omitted). "A

naked conclusion and mere recitation that the opinion is based upon all of the evidence without an analysis of the evidence in writing is inimical to a rational system of administrative determination and ultimately inadequate." *Istivan v. United States*, 231 Ct. Cl. 671, 676 (1982) (quoting *Beckham v. United States*, 183 Ct. Cl. 628, 636 (1968) (cleaned up) (citations omitted)). In other words, while a special master is presumed to have considered record evidence, the special master is still required to set forth a rational basis for the decision through analysis of the evidence. *See Paluck v. Sec'y of Health & Hum. Servs.*, 786 F.3d 1373, 1380 (Fed. Cir. 2015) ("While review of the factual findings made by a special master is highly deferential, both the Court of Appeals for the Federal Circuit and the Court of Federal Claims have a duty to ensure that the special master has properly applied Vaccine Act evidentiary standards, considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision." (citations and internal quotations omitted)).

Both petitioner and the government agree an analysis which fails to connect conclusions to evidence on paper is arbitrary and capricious. *See* 18 June 2026 Oral Argument Transcript ("Tr.") at 47:17–20, ("THE COURT: For petitioner, if the chief special master failed to weigh the evidence in writing to back up his conclusions, is that arbitrary or capricious? [PETITIONER]: Yes."), 47:23–48:2 ("THE COURT: If the chief special master failed to weigh the evidence in writing to back up his conclusions, isn't that by definition arbitrary or capricious? [THE GOVERNMENT:] Yes."), ECF No. 73. Considering, as the Chief Special Master notes in the Decision, "the outcome in [these] cases is mostly a function of the evidence before the special master," SM Dec. at 28, the government agrees an analysis which does not weigh record evidence is arbitrary and capricious, *see* Tr. at 7:19–22 ("THE COURT: So, if there were an analysis which does not analyze evidence from the specific case at hand, that would be arbitrary or capricious? [THE GOVERNMENT:] Yes."). Accordingly, in addition to directives from binding caselaw, the parties agree an analysis must connect conclusions to record evidence and the relevant question is whether the Chief Special Master properly connected his conclusions to record evidence in the Decision. *See supra*. The Court next assesses whether the Chief Special Master has properly "considered the relevant evidence of record, drawn plausible inferences, and articulated a rational basis for [his] decision." *Paluck*, 786 F.3d at 1380 (quoting *Hines*, 940 F.2d at 1528).

Petitioner argues the Chief Special Master's failure to reference relevant record evidence in his analysis is arbitrary and capricious. *See* Mot. for Rev. at 5. The government asserts the Chief Special Master addresses petitioner's evidence by "generally discuss[ing] that petitioner submitted case reports and also summariz[ing] petitioner's molecular mimicry theory which comes from the evidence . . . ." Tr. at 9:6–9. The government further contends the Chief Special Master's "discussion of the medical records and expert reports are also part of his analysis in this case, even though they don't appear in the analysis section." Tr. at 8:10–13; *see also* SM Dec. at 2–16. As Judge Somers similarly observed when reviewing the Chief Special Master in *Radke*, however, "the factual background does not contain 'findings of fact'; rather, it consists of a narration of the experts' opinions." *Radke v. Sec'y of Health and Hum. Servs.*, 181 Fed. Cl. 318, 329 (2026) (citation omitted). While the Chief Special Master's 33-page Decision here includes a lengthy summary of the expert reports, *see* SM Dec. at 4–16, the Chief Special Master's analysis is limited to only pages 30 through 33, *see id.* at 30–33. The government concedes the Chief Special Master's analysis is confined to the last three pages of the Decision. *See* Tr. at

8:21–24 ("[THE COURT:] you agree the analysis section is pages 30 through 33? [GOVERNMENT]: Yes."), 9:18–21 ("[THE GOVERNMENT:] in the earlier part of his decision, he goes to great lengths to cite the expert reports and some of the literature that's cited here, which is part of the decision, even if it's not in the analysis section."). Moreover, the government is unable to clearly identify where the weighing of record evidence occurs within the Chief Special Master's analysis. *See* Tr. at 8:25–9:11 ("THE COURT: In [pages 30 through 33,] are there any references to record evidence? [THE GOVERNMENT:] There is not citations, but it generally addresses the evidence that is in the record . . . so presumably that would come from the evidence even though he does not cite specific exhibits"), 11:1–5 ("[THE COURT:] Where does the weighing of evidence or the discussion of the articles that are most relevant occur in the analysis? [THE GOVERNMENT:] Well, it's somewhat woven into the beginning of his analysis . . . ."). The government acknowledges the only materials cited to and relied upon in the Chief Special Master's analysis are the Chief Special Master's own prior cases, not record evidence. *See* Tr. at 15:15–18 ("[THE COURT:] it looks to me that all of the materials cited here are evidence and analysis from prior cases. Is that a fair summary? [THE GOVERNMENT:] That's a fair summary."), 18:8–9 ("[THE GOVERNMENT:] I agree there is no citation to the evidence . . . ), 18:15–19 ("THE COURT: Would you agree . . . his analysis is based entirely on his own prior cases? [THE GOVERNMENT:] Those are the only cases that he cites, yes, he relies on.").

The government insists, despite the lack of discussion of record evidence, the Chief Special Master's reliance on his prior cases is simply "applying the evidence in this case to decisions that he's previously articulated and using those decisions as part of his articulation of his decision." Tr. at 14:10–13. The government agrees, however, the Chief Special Master does not draw express comparisons between the prior decisions and the present record. *See* Tr. at 11:25–12:4 ("THE COURT: Well, he doesn't compare anything, though. He just says other cases do this, that's like here, but he doesn't clarify how. [THE GOVERNMENT:] It's definitely an inference that has to be made."). Here, as in *Radke*, merely summarizing record evidence is insufficient to demonstrate the Chief Special Master "considered the relevant evidence of record, dr[ew] plausible inferences, and articulated a rational basis for the decision." *Paluck*, 786 F.3d at 1380 (citation and internal quotations omitted); *see also Radke*, 181 Fed. Cl. at 329 ("If a special master's decision concerns an issue repeatedly brought before the Vaccine Program, a few pages of analysis may suffice, but those few pages must demonstrate that the decision is 'the product of reasoned decision making.'"). Rather, record evidence must be connected to the Chief Special Master's conclusions to enable this Court to understand and review the Chief Special Master's reasoning. *See id.*; *accord Gechter v. Davidson*, 116 F.3d 1454, 1457 (Fed. Cir. 1997) ("Necessary findings must be expressed with sufficient particularity to enable our court, without resort to speculation, to understand the reasoning of the Board, and to determine whether it applied the law correctly and whether the evidence supported the underlying and ultimate fact findings."); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16, (2020). Accordingly, the relevant question is not whether the Chief Special Master summarized record evidence, as the Chief Special Master is already presumed to have considered the record. *See Moriarty*, 844 F.3d at 1328. The relevant question is whether the Chief Special Master considered and analyzed the record evidence, *see Paluck*, 786 F.3d at 1380, such that this Court can effectively review the Chief Special Master's reasoning, *see Radke*, 181 Fed. Cl. at 329; *accord Gechter*, 116 F.3d at 1457.

The Court next examines whether the Chief Special Master's analysis provides a reasoned explanation plausibly connected to record evidence from which the Chief Special Master's Decision may be reviewed. The section titled "Analysis" does not begin until page 27 of the 33 page decision. *See* SM Dec. at 27. Even still, pages 27 to 30 of the Decision provide a generic "overview of GBS and its treatment in prior program cases." *See id.* at 27–30 (cleaned up). Only two-and-a-half pages of the 33-page Decision purport to assess and conclude: "Petitioner Has not Carried His Burden of Proof." *See id.* at 30–33. The only citation to the record in the Analysis section is a footnote devoted to *Althen* prong two, which was immaterial to the Chief Special Master's Decision. *See id.* at 30 n.30 ("Although I need not also analyze Petitioner's success in meeting the other *Althen* prongs, I note that the second, 'did cause' prong is also not likely met, on the basis of the evidence in this case. . . ."). Considering the limited analysis, the Court next reviews each paragraph of the Chief Special Master's analysis for an articulated "rational basis for [his] decision." *Paluck*, 786 F.3d at 1380 (citation and internal quotations omitted).

It is helpful to frame the Court's paragraph-by-paragraph review with a brief summary of this court's affirmance and the Federal Circuit's affirmance of the Chief Special Master's Decision in *Cerrone v. Sec'y of Health & Hum. Servs.*, 2023 WL 3816718 (Fed. Cl. Spec. Mstr. June 1, 2023), *review denied, decision aff'd*, 168 Fed. Cl. 745 (2023), *aff'd*, 146 F.4th 1113 (Fed. Cir. 2025). On appeal, this court affirmed the Chief Special Master's *Althen* prong (1) analysis because, "[f]ar from glazing over Petitioner's evidence, the Chief Special Master carefully examined each piece of evidence presented and explained why he evaluated it as he did." *Cerrone v. Sec'y of Health & Hum. Servs.*, 168 Fed. Cl. 745, 754 (2023). When including citations to transcripts and the parties' briefs, the Chief Special Master's *Althen* prong one analysis cited record evidence 15 times in *Cerrone*, *see* 2023 WL 3816718, at *26–29, in stark contrast to zero times in the same section of Mr. Bickel's Entitlement Decision, *see* SM Dec. at 30–33. In the Decision denying entitlement to Mr. Bickel, the Chief Special Master did not carefully examine any piece of evidence presented by the petitioner, but instead relied on his "repeated prior exposure to its components in comparable cases." SM Dec. at 33. As the government readily concedes, the Chief Special Master did not complete a comparable analysis to the robust analysis in *Cerrone*. *See* Tr. at 45:3–7 ("[THE GOVERNMENT:] There's much more analysis in the Cerrone case, I agree.").

In contrast to the Chief Special Master's decision in *Cerrone*, this court recently vacated and remanded the Chief Special Master's Decision in *Radke v. Sec'y of Health & Hum. Servs.*, 2025 WL 3091516 (Fed. Cl. Spec. Mstr. Oct. 6, 2025), *review granted, opinion vacated*, 181 Fed. Cl. 318 (2026), because the Chief Special Master failed "to demonstrate that his conclusions were based on 'reasoned decisionmaking,' such that the Court c[ould] assess whether his decision was 'based on a consideration of the relevant factors and whether there has been a clear error of judgment,'" *Radke*, 181 Fed. Cl. at 323 (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16, (2020)) (other citations omitted). As Judge Somers found, the Chief Special Master's decision in *Radke* is "replete with conclusory statements," *id.*, and "replete with narration," *id.* at 328. The Chief Special Master's Decision here is plagued with the same failures that caused Judge Somers to remand in *Radke*, as demonstrated by the following paragraph-by-paragraph review.

To start, the first paragraph of the Chief Special Master's *Althen* prong one analysis simply introduces the proposition a special master is only required to evaluate relevant causation elements. *See* SM Dec. at 30. In the second paragraph, the Chief Special Master reiterates he has "several times determined that existing medical science does not support the contention that the Tdap vaccine can *likely* (i.e., be preponderantly shown to) cause GBS," *id.* at 30 (emphasis in original) (citations omitted), before listing prior conclusions about the theory's deficiency, *id.* at 31. The Chief Special Master offers no analysis to enable this Court to review the Decision, as he devotes half of his two-and-a-half page analysis section to narration of his prior findings, omitting any reference to specific record evidence. *Accord Gechter* 116 F.3d at 1457; *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16, (2020). In the next paragraph, the Chief Special Master notes this list of prior conclusions, which he refers to as factors, lead him "to reach the same conclusion in this case." SM Dec. at 32. While the Chief Special Master is presumed to have reviewed the relevant record evidence, *see Moriarty*, 844 F.3d at 1328, these paragraphs do not give the Court a basis to review whether the Chief Special Master has "considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision," *see Paluck*, 786 F.3d at 1380 (citation and internal quotations omitted).

In the next paragraph, the Chief Special Master at last "acknowledge[s]" the existence of the record evidence. *See* SM Dec. at 32. The third sentence reads: "This record reveals nothing that would make it more likely than not that the Tdap vaccine Petitioner received had initiated some kind of autoimmune process that would spark GBS symptoms within a few weeks." *Id.* This sentence is not supported by any citation and, as the government concedes, this sentence does not analyze any evidence. *See id.*; Tr. at 38:1–3 ("THE COURT: Does the sentence analyze any evidence? [THE GOVERNMENT:] No."). The next sentence of the Decision states "The medical literature provided in this case does not wholly disprove a causal association between the Tdap vaccine and GBS, but it certainly does not support one either." SM Dec. at 32. Again, this sentence is not supported with any citation. *See id.* While the government contends the Chief Special Master is referencing all the medical literature "filed in this case," Tr. at 38:10, this broad, unsupported reference provides no basis for review as "[a] naked conclusion and mere recitation that the opinion is based upon all of the evidence without an analysis of the evidence in writing is inimical to a rational system of administrative determination and ultimately inadequate." *Istivan*, 231 Ct. Cl. at 676 (cleaned up) (citation omitted); *see also* Tr. at 38:23–24 ("THE COURT: How do I check his homework? [THE GOVERNMENT:] I'm not sure."). The next sentence states: "Petitioner has not filed new scientific or medical reports/studies that would better support causation than in prior matters." SM Dec. at 32. Once again, there is no citation to support this statement. *See id.* While the government first argues the Court should look to "the other cases cited in the section," to compare prior scientific or medical reports/studies filed with the record evidence, *see* Tr. at 39:5–7, 20, the government ultimately agrees the Court cannot be sure what to review, *see* Tr. at 39:22–24 ("THE COURT: So we're not really sure what to review? [THE GOVERNMENT:] Not with certainty."). In the next sentence, the Chief Special Master states, without citation: "Rather, Petitioner offers multiple case reports that only show a temporal association between his vaccination and GBS." SM Dec. at 32. The Court cannot assess whether the Chief Special Master has "considered the relevant evidence of record, [and] drawn plausible inferences" without any citation to specific medical reports or studies. *Paluck*, 786 F.3d at 1380 (citation and internal quotations omitted).

As this court stated in *Radke*, "Even if the Court could divine flaws in Petitioner's causation theory itself, it cannot know which flaws influenced the chief special master's decision-making." *Radke*, 181 Fed. Cl. at 327.

In the subsequent paragraph, the Chief Special Master asserts his prior findings as a basis to find "Dr. Ahmed's BLAST search results returning sequence homologies is not sufficient evidence to support the conclusion that the Tdap vaccine likely causes GBS in this manner." SM Dec. at 32. In this paragraph, the Chief Special Master declares, without citation, "there is limited evidentiary value to homology showings as a general matter; more must be provided to show molecular mimicry is a reasonable mechanistic explanation for an autoimmune process." *Id.* While the Chief Special Master notes he "expressed this sentiment on multiple, previous occasions," the Chief Special Master fails to explain what "more" he requires to accept petitioner's molecular mimicry theory. *See id.*; *accord Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1380 (Fed. Cir. 2009) ("determination of causation in fact under the Vaccine Act involves ascertaining whether a sequence of cause and effect is 'logical' and legally probable, not medically or scientifically certain." (citations omitted)). As stated by petitioner, "[i]t's impossible to know what the special master meant by requiring more and it's impossible to meet that standard or for petitioners to know what that standard is on the state of this [decision]." Tr. at 57:19–23. The government is similarly unable to discern what "more" is required. *See* Tr. 52:15–20 ("[THE GOVERNMENT:] I'm not sure there's an answer to that in a vacuum."). Still, the government contends the Chief Special Master has not acted arbitrarily or capriciously, though the government, petitioner, and the Court alike are unable to discern what "more" the Chief Special Master requires to accept petitioner's theory. *See* Tr. at 49:3–9 ("THE COURT: If nobody can tell what would change the chief special master's mind on Althen Prong 1, is that evidence that the chief special master's January 2026 decision was arbitrary or capricious? [THE GOVERNMENT:] No, I don't think so, . . . "). The government's position is incorrect—if the Court cannot review the Chief Special Master's reasoning on *Althen* prong one, the Court cannot assess whether the Chief Special Master has properly set forth a rational basis for his Decision. *See Paluck*, 786 F.3d at 1380. Considering the Chief Special Master concludes Dr. Ahmed's evidence is insufficient without discussing Dr. Ahmed's BLAST search results or supporting literature, the Court can only speculate how the Chief Special Master reached this conclusion. *Accord Gechter*, 116 F.3d at 1457 ("Necessary findings must be expressed with sufficient particularity to enable our court, without resort to speculation, to understand the reasoning of the Board, and to determine whether it applied the law correctly and whether the evidence supported the underlying and ultimate fact findings.").

In the penultimate paragraph of the analysis, the Chief Special Master asserts petitioner has presented literature "common to many prior cases" without any "new findings that would justify another look at this oft-rejected theory." SM Dec. at 32. In addition, the Chief Special Master again only explicitly references his prior decisions analyzing medical literature throughout the paragraph. *See id.* at 32 (citing *Kaczerowski v. Sec'y of Health & Hum. Servs.*, 2025 WL 2798865 (Fed. Cl. Spec. Mstr. Aug. 28, 2025); *Hiatt v. Sec'y of Health & Hum. Servs.*, 2025 WL 3230494 (Fed. Cl. Spec. Mstr. Oct. 24, 2025), *rev. denied*, 180 Fed. Cl. 449 (2026)). The Chief Special Master states, "Petitioner's experts offer the same reports and studies offered in previous cases and make the same arguments as to their conclusions." SM Dec. at 32. Petitioner disagrees, noting "this case had different experts that talk about the evidence in

different ways and also presented, as far as we are able to tell, just by looking at titles in the docket, new evidence." Tr. at 44:1–4. Within the Chief Special Master's Decision, there is no connection between the petitioner's record evidence and the Chief Special Master's conclusion, and thus no basis for the Court to review whether the Chief Special Master has properly analyzed the evidence. *See Istivan*, 689 F.2d at 1038 ("A naked conclusion and mere recitation that the opinion is based upon all of the evidence without an analysis of the evidence in writing is inimical to a rational system of administrative determination and ultimately inadequate.") (citation omitted).

In the final paragraph, the Chief Special Master concludes: "In rejecting the theory advanced by Petitioner, I am drawing on my repeated prior exposure to its components in comparable cases, and finding—again—that it lacks preponderant support." SM Dec. at 33. Petitioner argues "there's no way for petitioners to tell how [these cases are] comparable because of the sealed records," and further suggests the only way for the Court to determine the cases are comparable to record evidence is "to go and find out by studying all the other cases what's comparable." Tr. at 43:20–25. The government suggests it is the reviewing court's job to analyze the record evidence presented by weighing it against evidence in prior cases. *See* Tr. at 40:25–41:3 ("THE COURT: So it's up to me to do the analysis of the doctor's report to the other cases and then to assess that? [THE GOVERNMENT:] It appears so."), 41:20–24 ("THE COURT: So it's up to me to compare that literature with whether or not it was cited in prior cases and then to determine if that was arbitrary or capricious? [THE GOVERNMENT:] Yes."). The Court's role, however, is not to reweigh or reanalyze petitioner's theory on review, but to assess whether the Chief Special Master has "considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for [his] decision." *See Paluck*, 786 F.3d at 1380 (citations and internal quotations omitted); *see also Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1349 (Fed. Cir. 2010) ("This court does not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses. These are all matters within the purview of the fact finder." (cleaned up) (citations and internal quotations omitted)).

In summary, the Chief Special Master did not "consider[] the relevant evidence of record, draw[] plausible inferences, and articulate[] a rational basis for [his] decision." *Paluck*, 786 F.3d at 1380 (quoting *Hines*, 920 F.2d at 1528). The Chief Special Master failed to weigh the evidence in writing to support his conclusions, which both parties agree is, by definition, arbitrary and capricious. *See* Tr. at 47:17–20 (petitioner), 47:23–48:2 (the government). Accordingly, the Court finds the Chief Special Master acted arbitrarily and capriciously by failing to provide a reasoned explanation for his Decision, and the Court vacates the Chief Special Master's decision denying entitlement and remands to the Chief Special Master to consider the relevant evidence, draw plausible inferences, and articulate a rational basis for whether petitioner's medical theory satisfies *Althen* prong one. *See Paluck*, 786 F.3d at 1380; Section X, *infra*.

## IX. Whether the Chief Special Master Properly Applied *Althen* Prong One

Petitioner argues the Chief Special Master's analysis is deficient because the Chief Special Master failed to faithfully apply the *Althen* standard to the evidence presented. Mot. for

Rev. at 4–5 (citing *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005)). In *Althen*, the Federal Circuit held a petitioner's "burden [for an off-table claim] is to show by preponderant evidence that the vaccination brought about [his] injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Althen*, 418 F.3d at 1278. The Chief Special Master denied petitioner compensation based solely on petitioner's failure to meet *Althen* prong one: "a medical theory causally connecting the vaccination and the injury." *See* SM Dec. at 30 ("Here, I find the first *Althen* prong is not satisfied—and this alone is a basis for denying entitlement." (footnote omitted)). Petitioner, citing *Knudsen v. Sec'y of Health & Hum. Servs.*, argues the Chief Special Master incorrectly denied compensation because *Althen* prong one also requires an analysis of record evidence, which the Chief Special Master failed to conduct. *See* Mot. for Rev. at 4–5 (citing *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548–49 (Fed. Cir. 1994)). The government argues the Chief Special Master correctly denied compensation by determining, with reference to similar analyses in prior opinions, petitioner's experts did not preponderantly prove a medical theory causally connecting the vaccination and the injury. *See* Gov't's Resp. at 11–13. Accordingly, the Court first assesses the proper standard under *Althen* prong one and then assesses whether the Chief Special Master properly applied this standard.

### A. Whether the Government and the Chief Special Master Correctly Articulated the Legal Standard Under *Althen* Prong One

In rejecting petitioner's medical theory under *Althen* prong one, the Chief Special Master conceded petitioner's theory "a Tdap vaccine could stimulate GBS . . . has a veneer of plausibility," but noted "*plausibility is not the evidentiary standard applied to the first Althen prong*." SM Dec. at 33 (citing *Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1122) (emphasis in original). In full, the legal standard the Chief Special Master applied under *Althen* prong one is as follows:

> Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." Such a theory must only be "legally probable, not medically or scientifically certain."
>
> Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or even a generally accepted medical theory. Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." Accordingly, special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury.

> In discussing the evidentiary standard applicable to the first *Althen* prong, the Federal Circuit has consistently rejected the contention that it can be satisfied merely by establishing the proposed causal theory's scientific or medical *plausibility*. And petitioners always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence.

SM Dec. at 21–22 (citations omitted) (emphasis in original). Of note, save for the last sentence, the Chief Special Master's legal standard in this case is identical to the legal standard he applied in *J. v. Secretary of Health & Human Services. Compare* SM Dec. at 21–22 *with J. v. Sec'y of Health & Hum. Servs.*, 2021 WL 1232733, at *23 (Fed. Cl. Spec. Mstr. Jan. 4, 2021) (differing only in citations and the substantially similar final sentence: "Petitioners otherwise always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence, regardless of what evidentiary level of evidence on the 'can cause' prong is required."). On appeal to the undersigned in *J.*, the Court reversed the Chief Special Master's *Althen* prong one analysis for its application of the last paragraph of the legal standard, noting: "[t]he Federal Circuit did not reject outright the 'plausibility' standard for a *medical theory* in *LaLonde*, but instead said the petitioner must 'show both the medical plausibility of her theory of causation and that the injury was consistent with that theory.'" *J. v. Sec'y of Health & Hum. Servs.*, 155 Fed. Cl. 20, 43 (2021) (quoting *LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1340 (Fed. Cir. 2014) (citing *Hibbard v. Sec'y of Health & Hum. Servs.,* 698 F.3d 1355, 1365 (Fed. Cir. 2012))).

At oral argument, the government asserted the Chief Special Master applied the correct standard to deny entitlement under *Althen* prong one, notwithstanding the Court's prior remand in *J.* Specifically, the government argues the Federal Circuit explicitly rejected the "plausibility" standard in *Cerrone*, instead requiring a more burdensome showing of preponderance of the evidence—*i.e.*, petitioner must show it is more likely than not Tdap can cause GBS. *See* Tr. at 23:15–24 ("[THE GOVERNMENT:] My understanding of *J.* is part of the remand was related to the burden of proof under Althen Prong 1, which I believe you remanded as setting biologically plausible as the threshold, but subsequent Federal Circuit cases like *Cerrone* held that it should be more likely than not and that preponderance should be the standard under *Althen* 1. So the chief applied the correct standard in this case. So reversal on that ground I don't think would be appropriate in light of *Cerrone*."). As the government correctly points out, in a footnote in *Cerrone*, the Federal Circuit opined "the first *Althen* factor requires the petitioner to show a reliable medical theory of causation specific to the vaccine and injury in question, not merely one that is plausible." *Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1121 n.3 (Fed. Cir. 2025). The government went on to argue, however, to the extent past Federal Circuit opinions embraced the plausibility standard, *Cerrone* overruled these precedents. *See* Tr. at 59: 1–6 ("THE COURT: And *Cerrone* cannot be read in conjunction with *Andreu* or *Knudsen*, those are incorrect standards, the quotes that I read from them? [THE GOVERNMENT:] As I understand them, yes. Because it requires more than a plausible theory and re-asserts the preponderance of evidence standard."). The government's position merits further analysis, as it directly contradicts the Federal Circuit's statement it has "consistently" rejected the plausibility standard in its past decisions. *See Cerrone*, 146 F.4th at 1121 n.3 ("As noted, the court's precedents *have consistently held* that the first *Althen* factor requires the

petitioner to show a reliable medical theory of causation specific to the vaccine and injury in question, not merely one that is plausible." (emphasis added)).

Until the Federal Circuit's opinion in *Cerrone* in July 2025, the Federal Circuit had never held a plausible medical theory was insufficient under *Althen* prong one—instead the Federal Circuit only required more than a plausible theory of causation with reference to the broader three-prong *Althen* analysis as a whole. *Compare Cerrone*, 146 F.4th at 1121 n.3 (Fed. Cir. 2025) ("As noted, the court's precedents have consistently held that the first *Althen* factor requires the petitioner to show a reliable medical theory of causation specific to the vaccine and injury in question, not merely one that is plausible.") (implying support from prior citations to *LaLonde*, 746 F.3d at 1339; *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1360 (Fed. Cir. 2019); *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013); *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1325 (Fed. Cir. 2010)) *with LaLonde*, 746 F.3d at 1339; *Boatmon*, 941 F.3d at 1360; *W.C.*, 704 F.3d at 1356; *Moberly*, 592 F.3d at 1325. In all the cases cited for the rejection of plausibility in *Cerrone*, the Federal Circuit held plausibility was insufficient for the broader three-prong *Althen* analysis—not for prong one specifically. For example, in *LaLonde*, the Federal Circuit did not state "plausibility" was insufficient under *Althen* prong one, but instead stated "a 'plausible' theory of causation" falls short of "the statutory standard of preponderance of the evidence," which is established by all three *Althen* prongs in tandem. *LaLonde*, 746 F.3d at 1338–39. There, petitioner's claim failed, in part, because petitioner's expert failed to "support his testimony with a reputable or scientific explanation that pertained specifically to [petitioner's] case." *Id.* at 1440. In *Boatmon*, the Federal Circuit held plausibility was insufficient for the broader *Althen* preponderance standard before looking at *Althen* prongs one and two individually—the Federal Circuit separately held petitioner also failed under *Althen* prong one because petitioner's expert offered an unsound and unreliable theory. *See Boatmon*, 941 F.3d at 1359–62. Even if *Boatmon* could have been interpreted to require more for *Althen* prong one, the Federal Circuit later reiterated "proof of causation does not require identification and proof of specific biological mechanisms" and clarified "*Boatmon* did not, and indeed, could not, overrule these previous articulations of the standard for causation." *Kottenstette v. Sec'y of Health & Hum. Servs.*, 861 F. App'x 433, 441 (Fed. Cir. 2021) (citations and internal quotations omitted). *W.C.* and *Moberly* similarly held plausibility was insufficient for the broader *Althen* analysis, without specifying plausibility was insufficient for *Althen* prong one specifically. *See W.C.*, 704 F.3d at 1356;[1] *Moberly*, 592 F.3d at 1325.[2]

---

[1] In full, the Federal Circuit's rejection of plausibility in *W.C.* held:

> Nonetheless, the petitioner must do more than demonstrate a "plausible" or "possible" causal link between the vaccination and the injury; he must prove his case by a preponderance of the evidence. *Moberly,* 592 F.3d at 1322. Specifically, a petitioner seeking to prove causation in an off-table case must provide: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Althen,* 418 F.3d at 1278.

*W.C. v. Sec'y of Health and Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013)

[2] In full, the Federal Circuit's rejection of plausibility in *Moberly* held:

> While the petitioners acknowledge that the statute requires proof of causation by a preponderance of the evidence, *see* 42 U.S.C. § 300aa–13(a)(1)(A), they appear to be arguing for a more relaxed

Even if *Cerrone*'s rejection of a "merely plausible" theory under *Althen* prong one had already been articulated in the past opinions cited, the *Cerrone* decision must still be reconciled with the Federal Circuit's prior decisions embracing plausibility. For example, in *Andreu*, the Federal Circuit viewed medical plausibility as sufficient and perhaps even too *stringent*:

> Prior to *Althen,* special masters applied the so-called *Stevens* test to determine whether a vaccine caused a claimant's injury. *See Stevens v. Sec'y of Health & Hum. Servs.,* No. 99–594V, 2001 U.S. Claims LEXIS 67, 2001 WL 387418 (Fed. Cl. Spec. Mstr. Mar. 30, 2001). This test required "[p]roof of confirmation of medical plausibility from the medical community and literature" in order to establish causation. *Id.* at *95–96, 2001 WL 387418. In *Althen,* however, we expressly rejected the *Stevens* test, concluding that requiring "objective confirmation" in the medical literature prevents "the use of circumstantial evidence . . . and negates the system created by Congress" through the Vaccine Act. 418 F.3d at 1280. Here, however, the special master resurrected the defunct *Stevens* test in an effort to discredit Tornatore's theory of causation.

*Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009). In *Cerrone*, the Federal Circuit distinguished *Andreu* as consistent with rejection of "plausibility" under prong one because *Andreu* "merely not[ed] that the government had not disputed the medical plausibility of the petitioner's theory of causation." *Cerrone*, 146 F.4th at 1121 n.3 (citations omitted). The Federal Circuit in *Andreu*, however, went to great lengths to distinguish medical causation from legal causation under *Althen* prong one, noting: "[i]n medical research, attribution of causation is typically not made until a level of *very near certainty*—perhaps 95% probability—is achieved," while a "determination of causation in fact under the Vaccine Act involves ascertaining whether a sequence of cause and effect is *'logical' and legally probable, not medically or scientifically certain.*" *Andreu*, 569 F.3d at 1380 (citing *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548–49 (Fed. Cir. 1994)) (emphasis added in *Andreu*) (other citations omitted). Stated differently, the Federal Circuit in *Althen* explained what the law requires in establishing when a medically or scientifically uncertain theory is nonetheless acceptable as logical or legally probable: "A persuasive medical theory is demonstrated by proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury, *the logical sequence being supported by reputable medical or scientific explanation, i.e., evidence in the form of scientific studies or expert medical testimony*." *Althen*, 418 F.3d at 1278 (emphasis added) (citation and internal quotations omitted). Moreover, in *Knudsen*, on which the Federal Circuit relied in *Althen*, *Cerrone*, and *Andreu*, the Federal Circuit embraced plausibility and made clear no showing of a specific biological mechanism was required: "*It is entirely plausible, and contemplated by the statute*, that DTP may cause an encephalopathy at the same time that a virus or something else causes non-encephalopathic symptoms or injuries. So long as it has not been shown that the virus or other unrelated factor

---

> standard. They repeatedly characterize the test as whether Molly's condition was "likely caused" by the DPT vaccine. By that formulation, however, they appear to mean not proof of causation by the traditional "more likely than not" standard, but something closer to proof of a "plausible" or "possible" causal link between the vaccine and the injury, which is not the statutory standard.

*Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010).

caused the encephalopathy or injury complained of, *compensation is not foreclosed*." *Knudsen*, 35 F.3d at 550 (emphasis added); *see also id.* at 549. Considering the Federal Circuit in *Cerrone* declared its rejection of plausibility to be consistent with the Federal Circuit's embrace of plausibility in *Andreu* and *Knudsen*, *see Cerrone*, 146 F.4th at 1121 n.3, the government is incorrect to argue the three cases cannot be read consistently, *see* Tr. at 59: 1–6, and additional clarification is necessary to find the throughline.

Less than a year after holding "the first *Althen* factor requires the petitioner to show a reliable medical theory . . . not merely one that is plausible," *Cerrone*, 146 F.4th at 1121 n.3, the Federal Circuit expressed it was "troubled by inconsistent findings on identical facts by different special masters" under *Althen* prong one, *see Gamboa-Avila v. Sec'y of Health & Hum. Servs.*, 166 F.4th 1318, 1323 (Fed. Cir. 2026). Considering the Chief Special Master in this case cited two special master decisions concluding Tdap could cause GBS before finding Tdap could not cause GBS, *See* SM Dec. at 29, the Court shares the Federal Circuit's concern for the lack of clarity special masters must navigate when deciding *Althen* prong one. Indeed, on review of the binding precedent, special masters are seemingly asked to thread a needle with no eye: while petitioners need not "provide conclusive evidence in the medical literature," *see Andreu*, 569 F.3d at 1377, special masters must still ensure a petitioner's medical theory is "supported by a sound and reliable medical or scientific explanation," *see Knudsen*, 25 F.3d at 548 (citations omitted). Likewise, while a petitioner need not present "proof of specific biological mechanisms," *Knudsen*, 35 F.3d at 549, a petitioner must still "prove a medical theory by a preponderance of evidence," *Kalajdzic v. Sec'y of Health & Hum. Servs.*, 2024 WL 3064398, at *2 (Fed. Cir. June 20, 2024). Furthermore, the special master must avoid holding a petitioner to "scientific certainty" (which is too much), *see Andreu*, 569 F.3d at 1380, or "plausibility" (which is too little), *see Cerrone*, 146 F.4th at 1121 n.3, but instead must determine which medical theories are "reliable," *see id.*—all while ensuring no petitioner be required to provide more than circumstantial evidence, *see Althen*, 418 F.3d at 1278. Of paramount importance, a special master must ensure the "Vaccine Act [remains] a federal compensation program under which awards are to be made to vaccine-injured persons quickly, easily, and with certainty and generosity," and must keep the program "fair, simple, and easy to administer." *See Knudsen*, 35 F.3d at 549 (cleaned up). After all, "the purpose of the Vaccine Act's preponderance standard is to allow the finding of causation in a field bereft of complete and direct proof of how vaccines affect the human body." *Althen*, 418 F.3d at 1280. In short, under a vaccine program designed to deliver compensation on an accelerated basis, special masters are nonetheless tasked with multi-year litigation disputes over narrow legal classifications. The Federal Circuit was so troubled by the inconsistent results from this legal framework it tasked this court with "adopting . . . a related-case rule or other mechanisms to avoid inconsistent rulings of the special masters." *Gamboa-Avila*, 166 F.4th at 1324.

Within the purview of this court for this particular case, the most effective "mechanism[] to avoid inconsistent rulings of the special masters," *id.*, would be a clear standard for deciding *Althen* prong one, *see Kisor v. Wilkie*, 588 U.S. 558, 572 (2019) (noting "well-known benefits of uniformity in interpreting genuinely ambiguous rules . . . [as] judges are most likely to come to divergent conclusions when they are least likely to know what they are doing"). As the Federal Circuit acknowledged in *Gamboa-Avila*, the "reliability-not-plausibility" standard articulated in *Cerrone* has not solved inconsistent findings under *Althen* prong one. *See Gamboa-Avila*, 166

F.4th at 1321–23. The Federal Circuit has unwaveringly required, however, a weighing of record evidence. *See id.* at 1322–23 (citing *Boatmon*, 941 F.3d at 1358, 1360). In other words, while the Federal Circuit expressed dismay at the inconsistent *Althen* prong one findings in *Gamboa-Avila*, it nonetheless affirmed the special master's decision because the special master rigorously engaged with the evidence to reach a decision. *See id.* at 1322. Consequently, when reviewing the Chief Special Master's *Althen* prong one analysis in this case, Federal Circuit precedent requires two things: (1) application of a "reliability-not-plausibility" standard, *see Cerrone*, 146 F.4th at 1121 n.3 ("the first *Althen* factor requires the petitioner to show a reliable medical theory of causation specific to the vaccine and injury in question, not merely one that is plausible"); and (2) an analysis of record evidence to determine reliability under *Althen* prong one, *see Gamboa-Avila*, 166 F.4th at 1322; *see also, e.g.*, *Moberly*, 592 F.3d at 1325 ("Because the evidentiary record in the *Andreu* case is significantly different from the record in this case, the result in *Andreu* does not compel the same result here."); *Kalajdzic*, 2024 WL 3064398, at *3 ("Contrary to the Kalajdzics' assertion, the Chief Special Master rejected Dr. Ahmed's expert testimony *based on case-specific reliability grounds*, not based on another expert's testimony from *D'Tiole*." (emphasis added)). Accordingly, the Court next assesses whether the Chief Special Master properly engaged with record evidence to assess the reliability of petitioner's medical theory under *Althen* prong one.

### B. Whether the Chief Special Master Properly Considered the Evidence to Determine Reliability Under *Althen* Prong One

Petitioner argues the Chief Special Master failed to adequately review his claims under *Althen* prong one because, while "each case [must] be judged on its individual facts and evidence," the Chief Special Master did not assess the record evidence in denying petitioner's molecular mimicry theory under *Althen* prong one. *See* Mot. for Rev. at 5–13. Specifically, petitioner argues the Chief Special Master: (1) failed to analyze two molecular mimicry articles in evidence which the Chief Special Master had never previously analyzed; and (2) failed to assess the merits of Dr. Ahmed's BLAST search analysis. *See id.* at 7–13. As detailed extensively in Section VIII, *supra*, the Chief Special Master did not reference record evidence in his denial of compensation for petitioner. The Chief Special Master did, however: (1) summarize petitioner's expert testimony on molecular mimicry prior to his analysis, *see* SM Dec. at 4–11; (2) liken petitioner's molecular mimicry theory to past cases in which he denied entitlement (without reference to record evidence), *see* SM Dec. at 30–33; and (3) conclude petitioner's molecular mimicry theory fails under *Althen* prong one, *see id.*

To review the Entitlement Decision under *Althen* prong one, the Court assesses whether the Chief Special Master may properly reject petitioner's molecular mimicry theory with reference to previously rejected molecular mimicry theories and without reference to record evidence. In his analysis, the Chief Special Master extensively referenced prior entitlement decisions in which he or another special master rejected molecular mimicry theories under *Althen* prong one. *See* SM Dec. at 28, 30–31 (citing *Kaczerowski v. Sec'y of Health & Hum. Servs.*, 2025 WL 2798865 (Fed. Cl. Spec. Mstr. Aug. 28, 2025); *Hiatt v. Sec'y of Health & Hum. Servs.*, 2025 WL 3230494 (Fed. Cl. Spec. Mstr. Oct. 24, 2025), *mot. for review denied*, 180 Fed. Cl. 449 (2026); *Dennington v. Sec'y of Health & Hum. Servs.*, 2023 WL 2965239 (Fed. Cl. Spec. Mstr. Apr. 17, 2023), *mot. for review denied*, 167 Fed. Cl. 640 (2023), *appeal dismissed*, 2024

WL 1255318 (Fed. Cir. Mar. 25, 2024). The Chief Special Master also conceded, however, some special masters have allowed a Tdap-GBS medical theory to proceed past *Althen* prong one, one of which theories was premised on molecular mimicry. *See id.* at 29 (citing *Harris v. Sec'y of Health & Hum. Servs.*, 2023 WL 2583393 (Fed. Cl. Spec. Mstr. Feb. 21, 2023); *Mohamad v. Sec'y of Health & Hum. Servs.*, 2022 WL 711604 (Fed. Cl. Spec. Mstr. Jan. 27, 2022)). While the Chief Special Master is not bound by prior contrary decisions when assessing petitioner's medical theory, the existence of such decisions emphasizes the importance of analyzing the evidence specific to this case. *See Boatmon*, 941 F.3d at 1358–59 ("[S]pecial masters are not required to distinguish non-binding decisions of other special masters. That is, in part, because causation in fact under the Vaccine Act is based on the circumstances of the particular case." (cleaned up)). As *Cerrone* established, a medical theory must be "reliable" to survive *Althen* prong one. *See Cerrone*, 146 F.4th at 1121 n.3. Petitioner presents "molecular mimicry" as his medical theory, and the Chief Special Master has himself conceded in other contexts "molecular mimicry" is "reliable" as a general matter. *See J. v. Sec'y of Health & Hum. Servs.*, 2022 WL 277555, at *4 (Fed. Cl. Spec. Mstr. Jan. 4, 2022) ("Dr. Zamvil, a qualified expert, certainly proposed a *reliable* mechanism (molecular mimicry) to explain how components of the vaccine could cross-react with homologous amino acid sequences making up nerve myelin . . . ." (emphasis added)).

While the Chief Special Master distinguishes the two prior Vaccine Act cases accepting Tdap-GBS causation theories, including molecular mimicry, under *Althen* prong one, SM Dec. at 29, the need to analyze evidence specific to this case persists—especially where the Chief Special Master has previously deemed molecular mimicry to be "reliable" in other contexts. To be sure, the Chief Special Master has clarified a petitioner must do more than simply cite a generally reliable medical theory such as molecular mimicry to succeed under *Althen*, but this distinction only emphasizes the need for an individualized review of evidence. *See J. v. Sec'y of Health & Hum. Servs.*, 2021 WL 1232733, at *32 (Fed. Cl. Spec. Mstr. Jan. 4, 2021), *mot. for review granted*, 155 Fed. Cl. 20 (2021) ("Thus, Dr. Zamvil relied on molecular mimicry—a generally accepted scientific explanation for many autoimmune diseases, to be sure, but one that cannot simply be invoked in every Vaccine Act claim to support causation."). As the Chief Special Master himself caveats in finding molecular mimicry generally reliable, such a finding does not mean molecular mimicry can "simply be invoked in every Vaccine Act claim to support causation"—rather, a petitioner must support the theory with evidence. *Id.*; *see also Althen*, 418 F.3d at 1278. Conversely, where, as here, petitioner presents evidence to support his molecular mimicry theory, the Chief Special Master cannot simply rely on his past opinions to reject the applicability of molecular mimicry as a general matter—rather, the Chief Special Master must meaningfully engage with the evidence presented.[3] *See Paluck v. Sec'y of Health & Hum.*

[3] Here, petitioner argues: (1) he adduced two molecular mimicry research articles the Chief Special Master has never analyzed before; and (2) Dr. Ahmed presented BLAST search results to establish molecular mimicry, as well as medical literature corroborating the probative value of his BLAST search results for a Tdap-GBS link which the Chief Special Master has never reviewed before. *See* Mot. for Rev at 7–13, ECF No. 68. The Court takes no position on whether this evidence establishes reliability, but instead simply assesses whether the Chief Special Master made a proper determination of reliability. In the absence of *any* analysis of record evidence for this Court to review, the Court lacks a basis to determine whether the Chief Special Master was correct not to analyze this specific evidence. *Accord Gechter v. Davidson*, 116 F.3d 1454, 1457 (Fed. Cir. 1997). While the Chief Special Master need not reference every piece of record evidence in his analysis, *see Moriarty*, 844 F.3d 1322, 1328 (Fed. Cir. 2016), his decision must nonetheless "properly appl[y] Vaccine Act evidentiary standards, consider[] the

*Servs.*, 786 F.3d 1373, 1380 (Fed. Cir. 2015). Absent an analysis explaining why *petitioner's* evidence fails to establish reliability, this Court lacks any basis to assess the Chief Special Master's ruling on reliability. *Accord Gechter v. Davidson*, 116 F.3d 1454, 1457 (Fed. Cir. 1997) ("Necessary findings must be expressed with sufficient particularity to enable our court, without resort to speculation, to understand the reasoning of the Board, and to determine whether it applied the law correctly and whether the evidence supported the underlying and ultimate fact findings."); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16, (2020). Accordingly, on remand the Chief Special Master must analyze whether petitioner's molecular mimicry theory is reliable by analyzing at least some evidence presented by petitioner. *See Paluck*, 786 F.3d at 1380.

## X. Conclusion

For the foregoing reasons, the Court **GRANTS** petitioner's Motion for Review of the Special Master's Decision, ECF No. 64. The Court **VACATES** the Chief Special Master's Decision finding petitioner did not satisfy *Althen* prong one because the Decision was arbitrary, capricious, or otherwise not in accordance with law and **REMANDS** to the Chief Special Master to consider the relevant evidence, draw plausible inferences, and articulate a rational basis for whether, in accordance with this Opinion and Order, petitioner's medical records demonstrate his tetanus-diphtheria-acellular-pertussis vaccine caused his case of Guillain Barré Syndrome. The Chief Special Master **SHALL** issue a new entitlement decision within **90 days** of this decision. *See* 42 U.S.C. § 300aa-12(e)(2)(C); RCFC App'x B, Rule 28(b).

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge

relevant evidence of record, draw[] plausible inferences and articulate[] a rational basis for the decision" to withstand review by this Court, *see Paluck v. Sec'y of Health & Hum. Servs.*, 786 F.3d 1373, 1380 (Fed. Cir. 2015) (citations and internal quotations omitted).